UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| BENSON DERANN MANENTO, and MARCUS LATRELL FOSTER, *individually and as parent and natural guardian of N.F., a minor*,<br><br>Plaintiffs,<br><br>v.<br><br>DOMENIC SCUDERA, DANIEL HOOVER, JACOB KURSCHNER, RYAN PULS, RYAN BOHLAND, *each acting in their individual capacity as Dakota County Sheriff's Office officers*, and DAKOTA COUNTY,<br><br>Defendants. | Civil No. 23-566 (JRT/TNL)<br><br>**MEMORANDUM AND ORDER OF LAW GRANTING DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS** |

Eric A. Rice, **LAW OFFICE OF ERIC A. RICE, LLC**, 1 West Water Street, Suite 275, St. Paul, MN 55107, for Plaintiffs.

William M. Topka, **DAKOTA COUNTY ATTORNEY'S OFFICE**, 1560 Highway 55, Hasting, MN 55033, for Defendants.

This case presents an unfortunate series of events that could have led to potentially lethal consequences. Plaintiffs sue Dakota County and five of its officers for alleged violations of their constitutional and state rights after they were pulled over and briefly held at gunpoint. The instigating incident was an alleged stabbing that was later determined to have been self-inflicted. A Cannon Falls Police Department officer

responded to the stabbing and found a wounded victim, who falsely claimed that he had been assaulted by two black men.

Subsequently, an anonymous 911 caller provided a tip that two black men matching the descriptions provided by the victim had been seen near Hampton, Minnesota with two ATVs and a truck. An officer spotted Plaintiffs, who were driving a truck with two ATVs on it and pulled them over. Because there had been a suspected stabbing, the officers approached the Plaintiffs' vehicle with their firearms engaged, removed the Plaintiffs, handcuffed them, and placed them in separate squad cars. After identifying the Plaintiffs, the officers determined that they did not match the description provided by the alleged victim and released them.

Because the Court finds that the 911 tip had sufficient indicia of reliability, the Court concludes that Deputy Scudera had reasonable suspicion sufficient to conduct the initial stop. Additionally, the Court finds that Plaintiffs did not sufficiently allege unreasonable use of force because the officers had reason to believe that the suspects were armed and dangerous, and they were not held at gunpoint for an unreasonable period of time. Finally, the Court finds that under Eighth Circuit precedent, the stop never elevated into an arrest despite the fact that the Plaintiffs were handcuffed and placed in squad cars because the officers took those actions to protect themselves and released them shortly after identifying them. Additionally, the Court concludes that the officers are entitled to qualified immunity and official immunity. Finally, the claims against Dakota

County will be dismissed because the county cannot be held vicariously liable for the officers' conduct. Therefore, the Court will grant judgment on the pleadings to Defendants and dismiss the case without prejudice.

## BACKGROUND

### I. FACTS

Plaintiffs Benson Derann Manento and Marcus Latrell Foster, individually and as the parent of N.F., a minor, claim that Defendants violated their constitutional and state rights when they were wrongly pulled over, held at gun point, handcuffed, and placed in squad cars before being released. (*See generally* Compl., Mar. 9, 2023, Docket No. 1.) Defendants Domenic Scudera, Daniel Hoover, Jacob Kurschner, Ryan Puls, and Ryan Bohland (together "Defendants" or the "Deputies") are deputies with the Dakota County Sheriff's Office. (Compl. ¶ 7.) Plaintiffs have also sued Dakota County, a municipal corporation, and the public employer of the Defendant Deputies. (*Id.* ¶ 8.)

### A. The Stabbing and Anonymous Tips

On July 22, 2022, at approximately 7:43 p.m., Officer Truax of the Cannon Falls Police Department was dispatched to respond to a reported stabbing in Cannon Falls Cemetery. (*Id.* ¶ 30.) Officer Truax found an individual bleeding with an apparent stab wound. (*Id.*) The person had other stab wounds and marks but reported that those had been self-inflicted. (*Id.*) The wounds were sufficiently severe for Officer Truax to request medical attention. (*Id.* ¶ 31.) When asked what happened, the apparent victim told Officer Truax that two black men were trying to rob him and that one of them stabbed

-3-

him. (*Id.*) He described one of the assailants as having very dark skin and a black hat, and the second as having a name tattooed on his left arm and gray basketball shorts. (*Id.*) He claimed that the suspects ran south or southeast after the incident. (*Id.*)

Shortly after, Officer Truax interviewed another person who was with the alleged victim, who told Officer Truax that the victim had a history of self-harm and mental health issues, including depression.[1] (*Id.* ¶ 33.) The person also explained that they had a disagreement with the victim shortly before the incident, causing the victim to leave and go for a walk. (*Id.*)

At an undetermined time, Sergeant Troolin of the Goodhue County Sheriff's Office requested an alert be issued to residents in the area to look out for "two black males, one in a black hat and one in gray shorts, because they were suspects in an assault in Cannon Falls." (*Id.* ¶¶ 39–40.) An anonymous caller ("Caller 1") responded to the alert and reported to Goodhue County 911 that "they saw two black men, one with a black hat and one with gray shorts, on a four-wheeler in a ditch near Hampton," and that "the men were near a truck with a trailer and another four-wheeler." (*Id.* ¶ 41.)

A second caller ("Caller 2") reported to 911 that "their 'family just told [them] they saw those two men on a four-wheeler' on Highway 56." (*Id.* ¶ 42.) The 911 operator noted that Highway 56 was "quite a ways west" of where the stabbing took place and

---

[1] After the events giving rise to this lawsuit, it was determined that there had been no attack and that the victim had made up the story. (Compl. ¶¶ 35–37.)

requested the contact information for the person who claimed to have actually seen the men.  (*Id.*)  The 911 operator called the person provided by Caller 2 and that person clarified that they did not actually see the men, but instead had heard that someone else had seen them and, in fact, told that person "not to call" because they might not have the correct information.  (*Id.* ¶ 43.)  After obtaining additional information, the 911 operator said they "think he did call in also," which suggests the person may have been Caller 1.  (*Id.*)

### B. The stop

At approximately 9:25 p.m., officers Bohland, Kurschner, Puls, and Hoover from the Dakota County Sheriff's Office ("DCSO") were assigned to "follow up on the 911 call reporting two Black men in the area who could be suspects in the stabbing."  (*Id.* ¶ 44.)  The Complaint alleges that "DCSO officers understood that the suspects were with two ATVs, a truck, and a trailer near Hampton."  (*Id.*)  Another DCSO officer, Deputy Scudera, was in the Hampton area when he saw a Tahoe drive by with a trailer and two ATVs and proceeded to initiate a stop. (*Id.* ¶ 45.)  Although the Complaint does not specify what Deputy Scudera knew exactly, the Complaint states that Deputy Scudera later said the stop was due to a "really weird call." (*Id.* ¶ 46.)  The Tahoe was being driven by Foster, who was accompanied by Manento and N.F.  (*Id.* ¶¶ 12–15.)  Foster pulled over to the side of the road and stopped the vehicle in response to the emergency lights.  (*Id.* ¶ 16.)

Deputy Scudera drew his firearm as he approached the Tahoe and shouted commands, which were allegedly difficult to hear because a DCSO dog was barking loudly.

(*Id.* ¶¶ 17–18.) Sergeant Hoover and Deputies Puls, Kurschner, and Bohland assisted with the stop. (*Id.* ¶ 47.) The Complaint claims that upon arriving, "multiple officers drew firearms and aimed them at the Tahoe during the initial portion of the stop." (*Id.*)

The Deputies ordered Foster to get out of the car with his hands up and to walk backwards toward them. (*Id.* ¶ 23.) Foster was then handcuffed and placed in a squad car. (*Id.* ¶ 24.) Manento was also ordered to get out of the vehicle and subsequently handcuffed and placed in a separate squad car. (*Id.* ¶ 25.) N.F. was removed from the car. (*Id.* ¶ 26.) Eventually, Manento and Foster were told that they had been stopped due to an alleged stabbing in Cannon Falls, and the Plaintiffs explained they had not been near that area on July 22, 2022. (*Id.* ¶¶ 27, 29, 53.) Both Foster and Manento are Black, but neither had a black hat, gray shorts, or a tattoo of a name on his arm. (*Id.* ¶¶ 48, 50.)

After detaining the Plaintiffs, Kurschner requested a contact for the Goodhue County Sheriff's Office to confirm whether they had the right vehicle. (*Id.* ¶¶ 54–55.) At that time, the Deputies learned that the stabbing may have been fabricated.[2] (*Id.* ¶ 56.) The Complaint alleges that the Deputies were concerned and frustrated and admitted that Manento and Foster did not match the description of the suspects involved in the alleged stabbing. (*Id.* ¶¶ 57, 60.) Manento, Foster, and N.F. were identified and released. (*Id.* ¶ 61.)

---

[2] The officers did not confirm that the stabbing was fabricated until 1:18 am of July 23, 2022—after the incident with Plaintiffs—when they interviewed the alleged victim in the hospital. (Compl. ¶ 35.)

The Complaint notes that Manento, Foster, and N.F. suffered humiliation and stigma from the encounter.  (*Id.* ¶¶ 62, 64.)  Manento, Foster, and N.F. allege that they have "experienced negative consequences" due to the incident, primarily "increased anxiety, fear, and other mental stresses."  (*Id.* ¶ 63.)

## II.  PROCEDURAL HISTORY

Plaintiffs bring claims under § 1983 for violation of their Fourth Amendment rights and conspiracy to violate constitutional rights, as well as for assault and false arrest under state law.  (Compl. at 11–15.)  Defendants answered Plaintiffs' Complaint and moved for judgment on the pleadings.  (Answer, Apr. 5, 2023, Docket No. 6; Mot. J. Pleadings, Apr. 5, 2023, Docket No. 7.)  The Plaintiffs oppose the motion.

## DISCUSSION

## I.  STANDARD OF REVIEW

Rule 12(c) of the Federal Rules of Civil Procedure provides that "[a]fter the pleadings are closed . . . a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c).  The Court analyzes a motion for judgment on the pleadings under the same standards as a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6).  *See Ashley Cnty., Ark. v. Pfizer, Inc.*, 552 F.3d 659, 665 (8th Cir. 2009).

In reviewing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court considers all facts alleged in the complaint as true to determine if the complaint states a "claim to relief that is plausible on its face."  *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  The

Court "accept[s] as true all facts pleaded by the non-moving party and grant[s] all reasonable inferences from the pleadings in favor of the non-moving party." *Syverson v. FirePond, Inc.,* 383 F.3d 745, 749 (8th Cir. 2004).  However, the Court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986).  In other words, a complaint "does not need detailed factual allegations" but must include more "than labels and conclusions, and a formulaic recitation of the elements" to meet the plausibility standard.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  "Judgment on the pleadings is appropriate only when there is no dispute as to any material facts and the moving party is entitled to judgment as a matter of law." *Wishnatsky v. Rovner*, 433 F.3d 608, 610 (8th Cir. 2006).

## II.   ANALYSIS

Defendants argue that each of Plaintiffs' claims must be dismissed because they either failed to state a claim upon which relief can be granted or because Defendants are entitled to qualified or official immunity.  Courts must resolve the question of whether qualified immunity applies as soon as possible to ensure that the party claiming it is not deprived of its primary benefit—immunity from suit.  *Ferguson v. Short*, 840 F.3d 508, 511 (8th Cir. 2016) (citing *Payne v. Britten*, 749 F.3d 697, 700 (8th Cir. 2014)).

To determine whether Defendants are entitled to qualified immunity, the Court conducts a two-part inquiry: (1) whether the facts, viewed in the light most favorable to Plaintiffs, demonstrate the deprivation of a constitutional or statutory right; and (2) whether the right was clearly established at the time of the deprivation. *Ryno v. City of*

*Waynesville*, 58 F.4th 995, 1004 (8th Cir. 2023). A right is clearly established when its contours are "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Thus, although the Court construes the facts in the light most favorable to plaintiffs, it must also view them from the "'perspective of a reasonable officer on the scene' given the probable cause standard." *Ryno*, 58 F.4th at 1005 (quoting *Royster v. Nichols*, 689 F.3d 681, 688 (8th Cir. 2012)). If the Court concludes that the alleged facts do not violate a constitutional right, then it need not address the second inquiry, and defendants are entitled to qualified immunity. *Id.* at 1005 (citing *Groenewold v. Kelley*, 888 F.3d 365, 371 (8th Cir. 2018)). Therefore, the Court will first address whether the facts alleged demonstrate any constitutional or statutory violation.

**A. Fourth Amendment Claims**

Plaintiffs' Section 1983 claims are each based on violations of their Fourth Amendment rights. The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "It is well established that both investigative stops and arrests are 'seizures' under Fourth Amendment law. However, while an investigative stop must be supported by reasonable, articulable suspicion that criminal activity may be afoot, an arrest must be supported by probable cause." *United States v. Raino*, 980 F.2d 1148, 1149 (8th Cir. 1992) (citation omitted).

Plaintiffs allege the following Fourth Amendment violations: (1) the Deputies did not have a sufficient basis to conduct the stop; (2) the Deputies employed excessive force when they approached the vehicle with their firearms drawn; (3) and the Plaintiffs were improperly arrested without probable cause.

### 1.     Investigatory Stop

A police officer "may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (citing *Terry v. Ohio*, 392 U.S. 1, 30 (1968)).  "Reasonable suspicion is a fact-specific inquiry, determined by the totality of the circumstances, taking account of an officer's deductions and rational inferences resulting from relevant training and experience."  *Irvin v. Richardson*, 20 F.4th 1199, 1204 (8th Cir. 2021) (citing *United States v. Arvizu*, 534 U.S. 266, 273-74 (2002)).  To determine whether reasonable suspicion exists, the Court may only look to the information that the officer possessed at the time.  *Waters v. Madson*, 921 F.3d 725, 736 (8th Cir. 2019) (citing *Terry*, 392 U.S. at 21–22).  The Supreme Court has stated that the reasonable suspicion standard is "less than probable cause."  *Arvizu*, 534 U.S. at 273.  When the information forming the basis of reasonable suspicion is from an anonymous tip, the tip must have "sufficient indicia of reliability."  *Alabama v. White*, 496 U.S. 325, 332 (1990).

Plaintiffs argue that the Deputies lacked objective facts giving rise to reasonable suspicion and request that the Court infer that the officers on the scene had information

-10-

that suggested the alleged stabbing had been fabricated and the 911 calls were not credible. But the Court finds that is not a reasonable inference because the officers on the ground were from a different law enforcement agency, and the Court must focus on what the Deputies conducting the stop knew at the time, in particular Deputy Scudera who initiated the stop. Though Plaintiffs point out that the Complaint does not specifically state what the Deputies knew or didn't know, the Complaint does state that they were assigned to follow up on the anonymous 911 call reporting the suspects were two Black men and also that "DCSO officers understood that the suspects were with two ATVs, a truck, and a trailer near Hampton." (Compl. ¶ 44.)

The Court concludes that under the totality of circumstances, there was a sufficient basis for reasonable suspicion. Caller 1 stated that they had seen "two Black men, one with a black hat and one with gray shorts, on a four-wheeler in a ditch near Hampton." (Compl. ¶ 41.) It is plausible that two suspects fleeing south or southwest on foot could have made their way from Cannon Falls to Hampton in a very short amount of time. Given that the tip by Caller 1 specifically mentioned the gray shorts and black hat as described in the initial alert, that the tip appears to have come in shortly after the alert was issued, and that Plaintiffs matched the tip's description of being with two ATVs, a truck, and a trailer, the Court concludes there was sufficient indicia of reliability to conduct an investigatory stop. *See Navarette v. California*, 572 U.S 393, 399–400 (2014) (noting that providing a detailed description close in time to the incident at issue suggests a level of

reliability sufficient to conduct a Terry stop). Therefore, the Court finds that Plaintiffs have failed to state a claim upon which relief can be granted with regard to the initial stop.[3]

Additionally, even if the Court were to determine that the Deputies lacked a reasonable suspicion—and thus conducted an unlawful Terry stop—they "may nonetheless be entitled to qualified immunity if [they] had *arguable* reasonable suspicion—that is, if a reasonable officer in the same position could have believed [he] had reasonable suspicion." *Waters*, 921 F.3d at 736. Because the Plaintiffs were spotted in the vicinity of where the Deputies were dispatched to, and because they matched the description of being with two ATVs, a truck, and a trailer. The Court finds that the Deputies had arguable reasonable suspicion and are entitled to qualified immunity.

### 2. Excessive Force

Plaintiffs allege that the officers used excessive force when they approached the vehicle pointing their firearms and shouting commands. "The right to be free from excessive force in the context of an arrest is a clearly established right under the Fourth Amendment's prohibition against unreasonable seizures." *Clark v. Clark*, 926 F.3d 972, 979 (8th Cir. 2019) (internal quotations and citation omitted). To determine whether a

---

[3] The Court will dismiss the case without prejudice. However, the Court expresses doubt that Plaintiffs can amend the Complaint to withstand a motion to dismiss by either removing references to what the officers knew at the time the vehicle was pulled over, or specifically stating that Plaintiffs are not asserting what the officers knew, given the facts already alleged.

particular use of force was excessive, courts must consider "whether it was objectively reasonable under the circumstances, relying on the perspective of a reasonable officer present at the scene rather than the 20/20 vision of hindsight." *Id.* (citation omitted) (cleaned up).

The Defendants argue that they were justified in drawing their weapons because Plaintiffs were suspects in a stabbing committed with a knife, which is a deadly weapon, and thus it was objectively reasonable for the Defendants to believe they were armed and dangerous. *See United States v. Johnson*, 31 F.4th 618, 623 (8th Cir. 2022) ("It is well established that officers may reasonably draw weapons during a Terry stop when the defendant is suspected of carrying a weapon—even if the defendant is otherwise cooperative."). The Eighth Circuit has previously found that officers were justified in pointing their guns at a suspect until he was removed from the vehicle, patted down, and restrained because they knew he had a weapon and believed he was attempting to evade capture. *Clark*, 926 F.3d at 979–80.

Plaintiffs argue that even if the initial stop was justified, the circumstances changed because the Plaintiffs stopped without issue, were compliant throughout, the Deputies did not find any weapons, and the Plaintiffs did not match the description of the suspects provided by the alleged victim. However, while the specific timing of the stop is not alleged, the Complaint does state that upon arriving, "multiple officers drew firearms and aimed them at the Tahoe **during the initial portion of the stop**." (*Id.* ¶ 48 (emphasis

added).) Critically, the Complaint does not allege that the guns were pointed at Plaintiffs even after the Deputies had taken control of the situation.

Therefore, the Court concludes that Plaintiffs have not sufficiently alleged the use of excessive force because the Eighth Circuit has only recognized such a claim in situations where guns were pointed at suspects "for unreasonably long periods of time, well after the police had taken control of the situation." *Id.*

### 3. Arrest

Plaintiffs further allege that the Defendants arrested the Plaintiffs without probable cause in violation of the Fourth Amendment when Plaintiffs were handcuffed. Here, the Court need not determine whether there was sufficient probable cause because it concludes that the Plaintiffs were never arrested, but merely detained. "[A]n action tantamount to arrest has taken place if the officers' conduct is more intrusive than necessary for an investigative stop." *Raino*, 980 F.2d at 1149 (internal citation and quotation marks omitted). However, an officer may take steps "reasonably necessary to protect his personal safety and to maintain the status quo" during an investigative stop without enacting an arrest. *Id.* (internal citation and quotation marks omitted); *see also United States v. Smith*, 645 F.3d 998, 1002 (8th Cir. 2011) (collecting cases). Additionally, officers may approach a suspect's car with guns drawn without elevating the investigative stop into an arrest as long as the officers' actions are "reasonable under the circumstances." *Id.* (citation omitted). A lawful Terry stop transforms into an arrest if the stop lasts for an unreasonably long time or if the officers use unreasonable force. *Irvin*,

20 F.4th at 1206 (citing United States v. Newell, 596 F.3d 876, 879 (8th Cir. 2010), cert. denied, 562 U.S. 864 (2010). The Eighth Circuit has provided several factors to consider when determining whether an investigative stop became an arrest:

> (1) the number of officers and police cars involved; (2) the nature of the crime and whether there is reason to believe the suspect might be armed; (3) the strength of the officers' articulable, objective suspicions; (4) the erratic behavior of or suspicious movements by the persons under observation; and (5) the need for immediate action by the officers and lack of opportunity for them to have made the stop in less threatening circumstances.

*Pollreis v. Marzolf*, 9 F.4th 737, 745 (8th Cir. 2021) (citing *Raino*, 980 F.2d at 1149–50).

Here, the length of the encounter is unknown, but the Complaint alleges that Deputies were investigating a violent crime committed with a weapon. Therefore, it was reasonable for the Deputies to take steps to protect their safety by handcuffing and placing the Plaintiffs in squad cars, with the reasonable suspicion that criminal activity was afoot. *See Waters v. Madson*, 921 F.3d 725, 732, 737–38 (8th Cir. 2019) (finding that handcuffing and placing a suspect in a squad car for nearly 20 minutes did not elevate an investigatory stop into an arrest because the officers reasonably believed the actions were necessary to preserve the status quo); *see also United States v. Smith*, 645 F.3d 998, 1001 (8th Cir. 2011)("We have repeatedly held that police officers may reasonably handcuff a suspect and place him in a squad car during the course of a Terry stop in order to protect their safety and maintain the status quo.").

Here, because the officers had a reasonable basis to suspect that Plaintiffs were armed and dangerous given the information they received about the stabbing, and because they were released promptly after they were identified, the Court concludes that the investigatory stop did not elevate into an arrest. Thus, Plaintiffs have not sufficiently alleged they were arrested or that the officers' conduct violated clearly established constitutional rights and the officers are entitled to qualified immunity.

**B.     Conspiracy**

The second basis for Plaintiffs' § 1983 claims hinges on the success of the Fourth Amendment claim, which the Court has already rejected. Nevertheless, the Court finds that the conspiracy claim fails for reasons independent of the Fourth Amendment claim. To prove a § 1983 conspiracy claim, a plaintiff must show: "(1) that the defendant conspired with others to deprive him of constitutional rights; (2) that at least one of the alleged co-conspirators engaged in an overt act in furtherance of the conspiracy; and (3) that the overt act injured the plaintiff." *White v. McKinley*, 519 F.3d 806, 814 (8th Cir. 2008) (citation omitted). Plaintiffs must also prove a deprivation of a constitutional right or privilege to prevail on their conspiracy claim. *Id.*

Plaintiffs' conspiracy claim fails because the Complaint does not give rise to a "plausible suggestion of conspiracy." *See Twombly*, 550 U.S. at 566. Although the Court must construe facts in favor of the non-moving party, the same is not true of legal conclusions, and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. In particular, a

conspiracy "requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made." *Twombly*, 550 U.S. at 556. Here, Plaintiffs do not point to any facts that suggest a meeting of the minds between the Defendants, nor do Plaintiffs allege any overt act in furtherance of the alleged conspiracy. Instead, Plaintiffs' Complaint merely restate the elements of conspiracy. (*See* Compl. ¶¶ 79–89.) Thus, the Court will dismiss the conspiracy claim without prejudice.[4]

### C. Assault and False Arrest

Plaintiffs bring assault and false arrest claims under state law based on the same events as the federal claims. The Court finds that Plaintiffs state law claims fail for the same reasons the federal claims do: a failure to sufficiently state a claim upon which relief can be granted. Additionally, the Defendant Deputies and the County are entitled to common-law official immunity for the state claims. *Rico v. State*, 472 N.W.2d 100, 106-07 (Minn. 1991) (stating that official immunity "protects from personal liability a public official charged by law with duties that call for the exercise of judgment or discretion unless the official is guilty of a wilful or malicious wrong."); *Mumm v. Mornson*, 708 N.W.2d 475, 490 (Minn. 2006) (The purpose of official immunity is to ensure that officers can "perform their duties effectively, without fear of personal liability that might inhibit the exercise of their independent judgment.").

---

[4] Defendants argue that the "intracorporate conspiracy doctrine" also bars this claim but the Court need not reach this question because Plaintiffs have failed to plausibly plead a civil conspiracy.

An exception to official immunity for willful and malicious conduct applies only when an officer knows or has reason to know he or she is doing something illegal. *Rico*, 472 N.W.2d at 107. Here, the parties agree that the Deputies' conduct was discretionary. Therefore, the question is whether the Complaint sufficiently alleges the Deputies had reason to know they were doing something illegal. Because the Court concludes that Plaintiffs have not plausibly plead any constitutional or statutory violations, the Deputies are entitled to official immunity.[5]

### D.    Vicarious Liability

Plaintiffs attempt to bring each of their claims against Dakota County as well, but the County cannot be held liable under a theory of vicarious liability for § 1983 claims. *See Rogers v. King,* 885 F.3d 1118, 1122–23 (8th Cir. 2018) (holding that "neither municipalities nor government officials may be held liable for unconstitutional conduct under a theory of respondeat superior"). Additionally, Dakota County is entitled to vicarious common-law official immunity when their public officials are themselves immune. *See Pletan v. Gaines*, 494 N.W.2d 38, 42–43 (Minn. 1992).

### E.    Leave to Amend

Plaintiffs request leave to amend to add additional factual allegations. Federal Rule of Civil Procedure 15(a) provides that a party may amend its pleading only with the

---

[5] Though "[w]hether or not an officer acted maliciously or willfully is usually a question of fact to be resolved by a jury," *Johnson v. Morris*, 453 N.W.2d 31, 42 (Minn. 1990), the Court need not reach that question in this case.

opposing party's written consent or the court's leave, and that the court "should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2).  Futility is a valid basis for denying leave to amend. *Moses.com Securities, Inc. v. Comprehensive Software Sys., Inc.*, 406 F.3d 1052, 1065 (8th Cir. 2005).  The Eighth Circuit has explained that "parties should not be allowed to amend their complaint without showing how the complaint could be amended to save the meritless claim." *Wisdom v. First Midwest Bank*, 167 F.3d 402, 409 (8th Cir. 1999).

Here, Plaintiffs only explain that they can amend the Complaint to add that one of the officers told one of the Plaintiffs that he was arrested during the encounter.  However, this vague assertion without more is not enough to survive Defendants' motion.  Plaintiffs do not explain whether the statement was made before Plaintiffs were detained, during the brief detention, or after they were released.  Nevertheless, although the Court denies the leave to amend, the Court will dismiss the case without prejudice.

## CONCLUSION

The Court will grant judgment to Defendants because Plaintiffs have failed to state a claim upon which relief can be granted and because Defendants are otherwise entitled to qualified and official immunities for their actions.  Additionally, the claims against the Dakota County are dismissed because it cannot be held vicariously liable for Defendants' actions.

**ORDER**

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Defendants' Motion for Judgment on the Pleadings [Docket No. 7] is **GRANTED** and Plaintiffs' Complaint is dismissed without prejudice.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED:  September 6, 2023
at Minneapolis, Minnesota.

                                                    JOHN R. TUNHEIM
                                          United States District Judge